**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

WILLIAM CARRERO,

        Plaintiff,

        v.

CITY OF CHICAGO,

        Defendant.

No. 23 CV 650

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Carrero, an employee of the defendant City of Chicago ("the City"), alleges that the City's COVID-19 vaccine mandate violated his rights under the First Amendment's Free Exercise Clause; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; the Illinois Human Rights Act ("IHRA"), 755 ILCS 5/2-102; and the Illinois Religious Freedom Restoration Act ("IRFRA"), 775 ILCS 35/15. Both Carrero and the City move for summary judgment on all four claims, along with the City's affirmative defense under the Illinois Tort Immunity Act ("TIA"), 745 ILCS 10/6104(a). [118], [122]. For the reasons explained below, the Court denies the City's and Carrero's motions for summary judgment. [118], [122].

The Court further orders counsel for the City to file an affidavit, outlined below, regarding discrepancies in its citations to legal authority that appear in its briefing.

## I.    Legal Standards

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001).

One note on Local Rule 56.1: "Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). Carrero objects to many of the City's Local Rule 56.1 statements of fact. *See generally* [128]. The City argues that nearly all its facts have been admitted or should be deemed admitted, "as Carrero fails to admit or deny the fact[s] … or support his denial with citations to record evidence." [136] at 1. The City's at-issue statements of fact, however, were largely irrelevant to the Court's disposition of the parties' motions for summary judgment. The Court therefore declines to adjudicate the parties' factual

2

disputes in the abstract and will only address disputed facts where necessary to resolve these motions.

## II. Relevant Facts

The following facts are undisputed unless otherwise noted. William Carrero began working for the City in 1997 or 1998 as a tree trimmer. [128] ¶ 1; [133] ¶¶ 6–7. On August 25, 2021, in response to the COVID-19 pandemic, the City announced its COVID-19 vaccination policy ("the Policy"). [133] ¶ 9. The Policy mandated that City employees be fully vaccinated against COVID-19 by October 15, 2021. [124-2] at 217. Employees were "considered fully vaccinated 14 days after receiving the final dose of a two-shot vaccine (Moderna or Pfizer) or a dose of a one-shot vaccine (Johnson & Johnson)." *Id.*

City employees could apply, however, for religious exemptions by filling out a form, which would be "reviewed by the Department of Human Resources on a case-by-case basis." [133] ¶ 10. The form included three sections: Section I collected basic identifying information, while Section II asked questions regarding the employee's religious beliefs and objections to COVID-19 vaccination, including a question regarding the employee's religious "objections to other vaccines or medications." [124-2] at 221-23. Section III required the employee's religious or spiritual leader to affirm that they had "met with" the employee "and provided religious or spiritual counsel," that the "employee is a member of [their] religious organization," and that the employee's "beliefs regarding any immunization or immunizing agent are in line with the tenets of our religious or spiritual faith, teachings, and/or practices." *Id.* at 223.

3

Carrero submitted his religious exemption request on September 30, 2021. [133] ¶ 13. Rather than complete the standard form, Carrero submitted a letter attached to an email that he sent to his manager and the City's vaccine exemption email account. *Id.* ¶ 15. Carrero's exemption request read:

> I am writing this letter to request a waiver using the Religious Exemption for the Covid 19 vaccine. Due to my sincere Christian beliefs & with what I know to date about the vaccine, my family and I strongly feel that this vaccine goes against our beliefs. Christianity teaches me that God through his son Jesus Christ is medicine to our souls (Proverbs 17:22). The Bible also teaches me that my body is the temple of the Holy Spirit (1 Corinthians 6:19), and to have caution when putting something, including medicines in it without first getting instruction from that Holy Spirit. Since some of the ingredients of the vaccine are derived from an aborted fetus, last but definitely not least would be God's mighty commandments stating that thou shall not kill (Exodus 20:13). Forcing me to obtain the vaccine is consenting to abortion which also goes against my Christian belief.
>
> As the mandate is underway, we do respect the rules and the science but our unction first & foremost when it comes to medicine or the like comes from God and my Christian Conscience. There has been put in place Healthcare conscience laws not only to protect Physicians but also those patients that for whatever reason would like to deny certain Healthcare, medicines, vaccines or testing. I believe that this was put in place for situations such as this mandate. Our goal is not to force our beliefs on anyone but to employ my body's right against a vaccine. Having personally experienced Covid with a hospital stay, I do believe that this Virus is real and that some may benefit from this vaccine. However, knowing that my God healed my body without any of the "virus killing" drugs, I assert that he is the healer of all diseases.
>
> Under these highly sensitive circumstances and with liability concerns, Religious leaders and Pastors alike & understandably so are hesitant to issue documents that confirm the type of church one attends. No Pastor or Religious Leader wants to be responsible for encouraging a member a vaccine when he is not their doctor and will not know what affect if any those vaccines will have on that person. Having been baptized and a member of my current church for close to 10 years, my Pastor, Dr. William S. Winston as a Missionary Leader is not personally meeting with his members as it is also a Mega Church with close to 15k members.

4

> Prior to attending the Living Word Christian Center, I was a faithful member of the New Life Community Church where Pastor Mark Jobe is the Senior Pastor. As you can see, I have been a Christian since my Mother and Father Christened me as a child. Should you require documents from my church confirming membership, that may be an easier task.
>
> It is with great appreciation that in reading and understanding my beliefs and conscience that you honor my request for the Religious exemption. As a committed employee to the City of Chicago for over 23 years, it is my goal to continue this relationship until the day I retire. Should you have any additional questions or concerns for me, please feel free to contact me at the number listed above. Thank you in advance for your consideration. Have a wonderful day.

*Id.*

Around two weeks later, Carrero checked in on his exemption request. *Id.* ¶ 17. His manager's assistant replied that "[t]here is a form that you were given to be filled out and signed by your religious representative." *Id.* ¶ 18. She offered to submit the "correct application" to the Department of Human Resources. *Id.*

Around three weeks later, Carrero received an email from the City's vaccine exemption email account. *Id.* ¶ 20. The email read:

> We received your request seeking a religious exemption from the COVID-19 vaccine requirement and need additional information. Please respond to each of the questions in Secon II of the form, including a response to the question:
>
> • Do your religious beliefs include objections to other vaccines or medications? If so, please explain.
>
> Additionally, the information provided in Section III (information from a Religious or Spiritual Leader) is insufficient. Please provide the information requested in Section III of the request form.
>
> Please provide this information within 5 business days. Failure to provide complete information may result in denial of your request for an exemption.

5

*Id.*

That same day, Carrero responded:

Thank you for responding to my request for a religious exemption. I have requested from my church and Pastor to sign the form but understandably so, the church will only confirm my membership and current and tenured standing as a congregant. They will not speak to my personal or moral issues as it relates to vaccines. Also, I just sent over a screenshot of the information from the site of the EEOC that confirms that a religious exemption request is **NOT required** to be signed by a spiritual or religious leader.

With that said and as stated in my previous letter, I have outlined my personal religious beliefs and continue to stand by those beliefs and will appreciate your understanding of not forcing me to do something that I believe will have strong implications against my faith. The accommodation will be greatly appreciated and will allow me to continue my position confidently.

*Id.* ¶ 22.

On December 2, 2021, Carrero received an email from the Department of Human Resources, which stated:

After receiving your request for a religious exemption from the City of Chicago's COVID-19 Vaccination Policy, we requested additional information to support your request. Because you failed to provide sufficient supporting information, your request for a religious exemption is denied.

Please note that under the Vaccination Policy, employees who do not have an approved medical or religious exemption must be fully vaccinated by December 31, 2021. Employees who are not fully vaccinated by December 31, 2021 may be placed in a non-disciplinary, no-pay status.

*Id.* ¶ 24.

Carrero replied that same day:

6

> I did not fail to submit the information requested. A formal letter was sent. The document that the City has requested will not be signed by my Church Leaders. If needed, I can submit that paperwork just personally signed by myself or someone else close to me that can attest to my beliefs. Please advise.

*Id.* ¶ 29. Carrero did not receive a response. *Id.* ¶ 30.

When Carrero reported to work on January 13, 2022, he was handed a letter putting him on "non disciplinary no pay status" until he received his first dose of a vaccination. *Id.* ¶ 31. That same day, Carrero sent an email to his manager and the vaccine exemption email account stating, in relevant part:

> Per my previous email, I stated that I had no issue submitting the paperwork supplied to me from Human Resources but that my Pastor(s) were not willing to sign documents attesting to my religious beliefs even as a member of the congregation.
>
> My employment is very important to me. However, the newly created vaccines being administered strongly goes against my religious beliefs. I've spelled out all the reasons in my previous letter submitted which answered every question on the form that we as employees were asked to complete with the exception of having the signature of my Pastor. I also know for a fact that there have been other city employees that did not submit the religious exemption requests on the forms requested by the city, yet their exemptions were approved. Please let me know what can be done to continue/resume my employment outside of getting vaccines that we now know for a fact does not prevent anyone from getting and/or spreading this virus. Your immediate response is greatly appreciated. Thank you in advance for your consideration.

*Id.* ¶ 32.

> The next day, Carrero's manager wrote to Carrero:
>
> I totally understand your plight, but these guidelines are set forth by the Chicago Public Health, the Dept. of Human Resources, and the Mayor. The rules are simple either have a religious or medical exemption and must be signed by the person agreeing to your exemption and must then be approved by DHR or your choice not be vaccinated which you will remain on no-pay status then after 30 days would be

7

terminated from your employment with the City of Chicago. Every employee in Forestry who has an exemption has been signed and approved by their pastor or medical profession and the DHR. I wish you blessings in your decisions.

*Id.* ¶ 33.

On January 31, 2022, Carrero emailed his manager and the vaccine exemption email account with a completed, or nearly so, COVID-19 Vaccine Religious Exemption Request form and asked whether his employment would resume. *Id.* ¶ 34. In response to the form's Section II question asking for his "reason for requesting a religious exemption to the COVID19 vaccine requirement," Carrero wrote:

My reason(s) for requesting a religious exemption to the COVID-19 Vaccine are mainly due to some of the ingredients within the vaccine. It is my understanding the aborted fetuses are used and since I am against abortions and the killing of babies in the womb, I am strongly against murder per God's word. The vaccine also does not prevent anyone from getting and/or spreading COVID-19 nor does it prevent hospitalization or death as I have learned in my own Father's Death. The vaccines that came out were administered under emergency authorization but wasn't even approved by the FDA until much later after introduction. Forcing this vaccine on the public not only goes against my Christian beliefs of consenting to abortion but also against my ability to protect innocent lives. When I began as a City of Chicago employee, my job also was never predicated on being vaccinated from a virus. I have to protect my body and what goes into it as it is very sensitive.

*Id.* ¶ 36.

In response to the Section II question asking Carrero to identify "the principle of your religious beliefs that conflicts with taking the COVID-19 vaccine" and to "include a description of the specific way that your religious beliefs prevent you from being vaccinated," Carrero wrote:

The principle again of my religious beliefs are based on biblical instruction. Per scripture, I am not to partake in the killing of anyone.

> With the vaccine specifically and maybe other meds that I may be unaware of, aborted fetuses have been known to be used. Killing babies or anyone is a sincerely held reason as to why we shouldn't be getting these shots. Exodus 20 verse 13 gives instruction on this issue. I do believe and agree with the Holy Bible that there are other ways that we can used to protect our health without killing the innocent.

*Id.* ¶ 37.

In response to the Section II question asking whether Carrero's "religious beliefs include objections to other vaccines or medications," Carrero wrote:

> My religious beliefs does include objections to other vaccines. For example, the HPV shot that was introduced to "protect" children from STDs or cancer is another vaccine that I disagree with. My religion says that children in no way should be sexually active and again that was a vaccine at the time that was newly created. In my family because of our religious beliefs did not agree with the HPV shot and therefore it was never and hasn't to this day be administered.

*Id.* ¶ 40.

Carrero submitted Section III as depicted below, without a name, signature, or affirmation from a religious or spiritual leader, and identifying himself as a Christian:

SECTION III: Religious or Spiritual Leader – Complete this section

Affirmation of belief: *I have met with and provided religious or spiritual counsel to the above employee regarding their sincerely held religious beliefs and practices. I affirm that this employee is a member of our religious organization. I further affirm that these beliefs regarding any immunization or immunizing agent are in line with the tenets of our religious or spiritual faith, teachings, and/or practices.*

Date (MM/DD/YYYY): _____

Religious or Spiritual Leader Name *(Printed)*

Telephone #: _____

Email: _____

Religious or Spiritual Leader Signature

Religion: *Christian*

*Id.* ¶ 42.

Less than an hour after Carrero sent this last email, a Department of Human Resources employee replied: "At this time your request for religious exemption remains denied because you failed to provide the information required." *Id.* ¶ 44.

The City rescinded the Policy on February 5, 2025, and offered to reinstate Carrero on March 17, 2025. *Id.* ¶¶ 56, 59. He returned to work for the City on April 1, 2025. *Id.* ¶ 60.

## III. Analysis

### A. Free Exercise Claim

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. CONST. amend I. To prevail on a First Amendment free exercise claim, a plaintiff must prove that a defendant "personally and unjustifiably placed a substantial burden on his religious practices." *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) ("A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."). This claim, like his Title VII and IHRA claims, requires Carrero to show that his beliefs are religious and sincerely held. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (a plaintiff proving a free exercise violation must "show[] that a government entity has burdened his sincere religious practice"); *Adeyeye v. Heartland Sweeteners, LLC,* 721 F.3d 444, 448 (7th Cir. 2013) (under Title VII, "[t]he test is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God") (citation omitted);

10

*Bagwe v. Sedgwick Claims Mgmt. Servs.,* 811 F.3d 866, 879 n.39 (Title VII and IHRA claims are analyzed together).

### 1.   Sincerity of Religious Belief

To demonstrate a sincerely held religious belief, a plaintiff need only show that his belief "is religious in [his] own scheme of things" and is sincerely held. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 811 (7th Cir. 2025) (cleaned up). This burden is low at summary judgment. *Id.* Courts "do not have the expertise to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy" and "should avoid putting themselves in the impossible position of trying to define religious legitimacy and viewpoint sufficiency." *Id.* (cleaned up)*; see also Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,,* 450 U.S. 707, 715 (1981) (noting that courts "should not undertake to dissect religious beliefs because … [the] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ"); *Korte v. Sebelius,* 735 F.3d 654, 683 (7th Cir. 2013) (under the Free Exercise Clause, "the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations").

### i.   Whether Carrero Was Consistent in His Religious Beliefs

In seeking a COVID-19 vaccine exemption, Carrero cited, among other beliefs, his belief (supported by citation to a biblical verse) that his "body is the temple of the Holy Spirit"; that "God … is the healer of all diseases"; that because "some of the ingredients of the vaccine are derived from an aborted fetus," vaccination would go

11

against "God's mighty commandments stating that thou shall not kill" (also supported by citation to a biblical verse); and, similarly, that vaccination would be akin to "consenting to abortion," in violation of his "Christian belief." [133] ¶ 15. In a later follow-up to his exemption request, Carrero reiterated his belief that vaccination would contravene his "Christian beliefs" against "[k]illing babies." *Id.* ¶¶ 36–37. Carrero echoed these beliefs in his deposition. *See, e.g.,* [128] ¶ 47 (testifying to his belief that "thou shall not kill," that "fetuses were used" in the vaccine, and that "God is our healer").

There is sufficient evidence then to permit a reasonable jury to find that Carrero's objection to receiving a COVID-19 vaccine was based on a sincerely held religious belief. *See Locke v. Chicago Fam. Health Ctr.,* No. 23-CV-4650, 2026 WL 622655, at *7 (N.D. Ill. Mar. 5, 2026) ("Plaintiff testified that 'injecting or allowing someone to inject something foreign into me to prevent me from possibly not catching something' would be contrary to her belief that God was her 'healer' and 'protector.' … Based on this, a reasonabl[e] jury could infer that Plaintiff believed that God, not vaccines, should ultimately be in charge of healing her body.").

But the sincerity and religiousness of Carrero's beliefs is not undisputed, as Carrero claims in his motion for summary judgment. [119] at 12. For example, the City puts forward evidence that Carrero has acted inconsistently with these beliefs by taking other medications and vaccinations that *were* developed with fetal cells. [123] at 9–10. The City deduces from this evidence that Carrero's beliefs were newly adopted in response to the vaccine mandate. *Id.* at 9. This evidence may impeach

Carrero's credibility and may persuade a factfinder to reject his claim that his objection to the COVID-19 vaccination was rooted in a sincerely held religious belief. *Gardner-Alfred v. Fed. Rsrv. Bank of New York,* 143 F.4th 51, 63 (2d Cir. 2025) (same). But it is not up to the Court to make credibility determinations or weigh evidence of consistency at summary judgment: That is a task for the jury. *Adeyeye,* 721 F.3d at 453 ("[C]onsistency in observance, practice, and interpretation … are matters of interpretation where the law must tread lightly.").

Moreover, evidence of inconsistency would not necessarily preclude a reasonable jury from crediting Carrero's statements and testimony about his religious beliefs. Inconsistent behavior is not dispositive of sincerity, as "even the most sincere practitioner may stray from time to time." *Gardner-Alfred,* 143 F.4th at 63–64 (declining to find dispositive, at summary judgment, evidence that a plaintiff took other medications developed from fetal cells, despite refusing vaccination on religious anti-abortion grounds) (quoting *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 791 (5th Cir. 2012)); *see also Grayson v. Schuler,* 666 F.3d 450, 454–55 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?").

Beyond its arguments regarding Carrero's other medications, the City also impeaches Carrero's credibility by questioning his inability to identify his particular

13

sect of Christianity,[1] by pointing to his failure to "experience any external sign or signal during prayer," and by deeming his research into vaccination options and vaccine components "apathetic" and un-"meaningful." [123] at 6–7. Again, Carrero has written and testified that his identity as a Christian, his belief that God is his healer, his anti-abortion religious beliefs, and his understanding that the COVID-19 vaccine was developed from aborted fetal cells prevented him from receiving the vaccine. In addition to that evidence, "a jury may very well find it relevant evidence of sincerity that [Carrero] was willing to risk his job" rather than receive the vaccine. *Adeyeye,* 721 F.3d at 454. This is enough for a reasonable jury to determine that Carrero's religious belief was sincerely held. *See, e.g., Locke,* No. 23-CV-4650, 2026 WL 622655, at *7 ("Plaintiff sufficiently put forth her belief that God was her 'healer' in her initial accommodation request, and maintained that position in her deposition. That is enough to survive summary judgment.") (cleaned up). The City's criticisms are appropriate fodder for impeachment before a jury, but not for granting summary judgment in its favor.

For these same reasons, however, the Court cannot conclude that Carrero's religious beliefs are sincere as a matter of law. As recited above, the City has introduced sufficient evidence challenging Carrero's credibility and the sincerity of

---

[1] Even if Carrero had identified with a particular Christian denomination, that self-identification would be irrelevant at summary judgment, as "[i]t is not within [the Court's] province to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy." *Adeyeye,* 721 F.3d at 452.

his religious beliefs. Because this question must be left for the jury, Carrero's motion for summary judgment must be denied.

### ii. Whether Carrero's Exemption Request Was Secular in Nature

The City also argues that Carrero's belief that the vaccine would harm his body is not a "religious" belief but instead a secular one. [123] at 5–6 (arguing that "*[t]o the extent that* Carrero's objection to the vaccine was based on his concern about putting a substance in his body generally … this is not a 'religious' belief") (emphasis added). Because the record contains sufficient information from which a reasonable jury could conclude otherwise, and because the law does not require an either/or choice, the Court is unpersuaded by this contention.

Though the City points to secular aspects of Carrero's objection, it does not argue that Carrero's objection is *purely* secular. [123] at 5. Nor can it, as Carrero's objection clearly references religious beliefs against abortion, grounded in a biblical passage stating that "thou shall not kill," and the belief that "God … is the healer of all diseases." [128] ¶ 46; [133] ¶ 15.

Furthermore, "a 'religious' objection can sound in *both* religious and non-religious terms." *Passarella v. Aspirus, Inc.,* 108 F.4th 1005, 1010 (7th Cir. 2024); *see also Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one."). For example, an employee may object to a vaccine requirement "on the view that receiving the vaccine would violate a religious belief *and* implicate health and safety concerns." *Passarella,* 108 F.4th at 1009. The

15

employee's objection need only be "at least in part" based upon religious belief. *Id.* "The job of choosing between those inferences is for the jury, not the district court on summary judgment." *Gardner-Alfred*, 143 F.4th at 64. A jury might infer, for example, that Carrero "has *both* secular *and* religious objections to the Covid-19 vaccines, which a reasonable jury could interpret to mean that [his] objection to the vaccination policy was grounded in [his] sincere religious beliefs despite [his] concurrent secular objections." *Id.*

Because the record supports a finding that Carrero's objection was not purely secular, the City's argument regarding the nature of Carrero's objections must be reserved for trial.

### 2.    Substantial Burden

The City argues that, even assuming his religious beliefs are sincerely held, Carrero has not demonstrated that the Policy substantially burdened those beliefs. [123] at 11–13. A substantial burden puts substantial pressure on a plaintiff to modify his behavior and to violate his beliefs. *Childs v. Webster,* 168 F.4th 1020, 1032 (7th Cir. 2026).

The City argues that Carrero could have received any of the available COVID vaccines because none "contain[ed]" aborted fetuses, fetal tissue, fetal cells, or fetal cell components. [123] at 12. But in his exemption request, Carrero objected based on his belief that "some of the ingredients of the vaccine are *derived* from an aborted fetus"—not that they *contained* aborted fetuses. [124] ¶ 46 (emphasis added). Perhaps, in his later deposition, Carrero could have been more exact or consistent in

16

explaining his religious objection to the role fetal cell lines played in the vaccines' development. *Id.* ¶ 47 (testifying that "aborted fetuses were used in the vaccine"); *id.* ¶ 49 (testifying that the vaccine "has aborted fetuses in it"); [124-2] Ex. 1 at 56:24-57:2 (testifying that "they used, not aborted but some kind of fetus but not just fetus but like the cells of the fetus" in the vaccine); *id.* at 81:4–5 (testifying that "they used fetal cells to come up with the vaccine"); *but see id.* at 79:21–22 (testifying that he did not know what fetal cell lines are). The Court, however, may not dissect Carrero's beliefs "because [they] are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas,* 450 U.S. at 715. That is a task for the jury.

Moreover, the City does not dispute that the three COVID-19 vaccines available to Carrero at the time he requested an exemption—the Moderna, Pfizer, and Johnson & Johnson vaccines—were "derived" from or were developed using fetal cell lines. *See* [124] ¶ 73 (arguing only that "no human fetal-derived cell lines or tissue are contained in the Novavax COVID-19 Vaccine, nor are fetal cells used in the development, manufacturing, or production."); *see also* [124-3] at 44 (City's Ex. 20) (stating that "some COVID-19 vaccines use a historic fetal cell line in production and manufacturing" and that although the Pfizer and Moderna vaccines do not use a fetal cell line in production and manufacturing, "a fetal cell line was used in a very early phase to confirm efficacy prior to production and manufacturing").

The City also argues that, because the Novavax COVID-19 vaccine was not developed using fetal cell lines, Carrero could have received that vaccine sometime

17

after it received FDA Emergency Use Authorization in July 22, 2022, without substantially burdening his religious beliefs. [123] at 11–13; [136] at 8. But as Carrero points out, the Policy repeatedly specifies that employees are considered fully vaccinated after receiving the second dose of the Pfizer or Moderna vaccines or a single dose of the Johnson & Johnson vaccine. [120-1] at 2, 5, 6.[2] That the Policy provides perhaps conflicting information—both explicitly excluding and implicitly including the Novavax vaccine—creates a factual dispute inappropriate for resolution at summary judgment. *See* [120-1] at 6 (while the Policy specifies that employees are considered fully vaccinated after receiving all doses of the Pfizer, Moderna, or Johnson & Johnson vaccines, the Policy also allows that "[e]mployees who receive a vaccination are responsible for scheduling and obtaining all recommended doses of … *a COVID-19 vaccine granted Emergency Use Authorization by the FDA*") (emphasis added). And even assuming that the Novavax vaccine would have been available to Carrero on July 22, 2022, and even assuming the Policy would have considered Carrero fully vaccinated after receiving the Novavax vaccine, Carrero still would have been left on no-pay status between January and July of 2022.

Finally, as Carrero points out, his religious objection to vaccination was based on factors beyond his opposition to the use of fetal cell lines that would have applied equally across all COVID-19 vaccines. [127] at 11. These are factors, as the Court explained above, that a jury must weigh.

---

[2] During Carrero's deposition, the City's counsel also referred to "the three options," or "three vaccine options" for COVID vaccination—presumably meaning the three options stated in the Policy. [124-2] Ex. 1 at 76:23, 81:20–21.

For these reasons, the sincerity of, and burden on, Carrero's religious beliefs must be determined by a jury.

### 3. Basis of Review

The City next argues that Carrero's Free Exercise claim must fail because the Policy, as applied to Carrero, was neutral, generally applicable, and had a rational basis, and therefore survives rational basis review. [123] at 13.

A neutral and generally applicable law or policy that incidentally burdens religious exercise is subject to rational basis scrutiny. *Fulton v. City of Philadelphia*, 593 U.S. 522, 523 (2021). A law or policy that is *not* both neutral and generally applicable is subject to strict scrutiny. *Id.*; *see also Kennedy,* 597 U.S. at 526 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny."). Carrero only disputes the Policy's general applicability. [119] at 11 n.3.

### i. Generally Applicable

Before considering whether the City's Policy was "generally applicable" as applied to Carrero, the Court must address a factual dispute. In the City's account of the facts, Carrero's exemption request was denied because he failed to answer Section II's question asking whether the employee's beliefs "include objections to other vaccines or medications" *and* he failed to submit Section III's religious affirmation. [145] at 7–8 (citing [132] ¶ 32). Carrero argues, however, that he answered Section II when he sent in the exemption request form on January 31, 2022, and that his exemption request was denied solely due to his failure to submit Section III's religious

affirmation. [120] ¶ 40; [135] at 5–6. Both parties point to record evidence supporting their interpretations of the facts. This factual dispute is one for the jury to resolve.

In any event, the parties agree that Carrero's request was denied at least in part because of his failure to submit Section III's religious affirmation. When the City requested that he submit an affirmation of belief from a religious leader, Carrero responded that his church and pastor "will not speak to my personal or moral issues as its related to vaccines." [128] ¶ 54. After the City denied Carrero's exemption request, Carrero reiterated that "[t]he document that the City has requested will not be signed by [his] Church Leaders," and offered to submit the document "personally signed by myself or someone else close to me that can attest to my beliefs." [133] ¶ 29. The City did not respond to this suggestion. *Id.* ¶ 30.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton,* 593 U.S. at 533 (cleaned up). "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable ... because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 537.

As explained by the district court earlier assigned to this matter when it denied in part the City's motion to dismiss, "the City's Policy permits exemptions only for members of 'religious organizations' whose religious leader says the member's beliefs 'are in line with the tenets of our religious or spiritual faith.'" [43] at 7. This language "tests … whether an applicant's religious beliefs align with the tenets of his or her

20

organized religion." *Id*. In other words, religious opposition to COVID-19 vaccines that is supported by an employee's religious organization is deemed "worthy of solicitude" and eligible for exemption from the Policy, while religious opposition to COVID-19 vaccines that is *not* supported by an employee's religious organization is *not* deemed "worthy of solicitude" and is *not* eligible for exemption from the Policy. *See Fulton*, 593 U.S. at 537 (cleaned up).

This distinction stymied Carrero's exemption request. Because Carrero's religious leaders would not affirm that his religious beliefs aligned with their church's tenets, Carrero could not complete Section III's religious affirmation. [124] ¶ 54; [120] ¶ 29. Because Carrero could not complete Section III's religious affirmation, the City denied his religious exemption. [120] ¶ 40; [132] ¶ 32. The City therefore "consider[ed] the particular reasons for [Carrero's] conduct"—religious opposition to the vaccine without evidence of alignment with church tenets—and denied Carrero the Policy's "mechanism for individual exemptions." *Fulton,* 593 U.S. at 533. The Policy was therefore not one of "general applicability," as applied to Carrero. *See Boyd v. Chicago Transit Auth.*, No. 24 C 2727, 2025 WL 2765107, at *6 (N.D. Ill. Sept. 28, 2025) (same conclusion regarding the Chicago Transit Authority's vaccination policy);[3] *see also Does 1-11 v. Bd. of Regents of Univ. of Colo.,* 100 F.4th 1251, 1273 (10th Cir. 2024) (strict scrutiny would apply where the government "considered the particular reasons

---

[3] As *Boyd* concluded: "[U]nder *Fulton* the salient point is that the CTA retained discretion in determining who did and did not qualify for an exemption … [B]ecause the CTA appears to have used its discretion to deny religious exemptions on an individual basis … the policy's application to Mr. Boyd must therefore be justified under strict scrutiny." *Boyd*, No. 24 C 2727, 2025 WL 2765107, at *6.

underlying the applicant's religious beliefs and provided individualized exemptions to applicants whose religious beliefs, in [its] discretion, justified an exemption") (cleaned up). Strict scrutiny is instead triggered. *Kennedy,* 597 U.S. at 526.

The City argues that its religious exemption process is generally applicable because the City "strictly adhered to its evaluation process," the evaluation process allowed exemptions for both religious and medical reasons, and because the City granted thousands of religious exemptions. [136] at 12. But these arguments miss the point. Regardless of how freely the City granted exemptions, the exemptions were not granted automatically or universally: The City still "retained discretion in determining who did and did not qualify for an exemption." *Boyd*, No. 24 C 2727, 2025 WL 2765107, at *6. "[W]hen there is discretion in applying a general policy, the denial of an exception in the face of a religious objection can raise the prospect of religious discrimination, and thus a Free Exercise Clause violation, even if there is no overt religious animus." *Bates v. Pakseresht*, 146 F.4th 772, 796 (9th Cir. 2025).

As the City itself admits, the "discretionary nature" of the exemption policy meant that "religious exemption requests would be reviewed on a case-by-case basis." [123] at 20. By requiring, pursuant to that "case-by-case" review, that an employee's religious opposition to vaccination align with the tenets of their religious organization, the policy "invite[d] the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up). It is therefore not a policy of general applicability.

22

For the City's motion for summary judgment to succeed, the Policy's application to Carrero thus must survive strict scrutiny. *See Dahl v. Bd. of Trs. of W. Michigan Univ.,* 15 F.4th 728, 733 (6th Cir. 2021) ("[W]here a state extends discretionary exemptions to a policy, it must grant exemptions for cases of 'religious hardship' or present compelling reasons not to do so.") (citing *Fulton,* 593 U.S. at 523).

### ii.     Strict Scrutiny[4]

A policy survives strict scrutiny if the government "demonstrate[es] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy,* 597 U.S. at 525. In cases where the government denies a plaintiff's religious exemption request, the "compelling interest" analysis is tailored to the plaintiff: "[C]ourts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton,* 593 U.S. at 541 (cleaned up).

The City argues that it had a compelling interest in controlling the spread of COVID-19. "Stemming the spread of COVID–19 is unquestionably a compelling interest[.]" *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 18 (2020). But the City's interest in stemming the spread of COVID-19 is not where this analysis ends. Again, "[t]he question … is not whether the [City] has a compelling interest in enforcing its [vaccination] policies generally, but whether it has such an interest in denying an exception to [Carrero]." *Fulton,* 593 U.S. at 541*; see also Boyd*, No. 24 C 2727, 2025 WL 2765107, at *6 ("When a policy's application to a specific plaintiff is

---

[4] The City argues only that the Policy survives rational basis review: It does not argue that the Policy survives strict scrutiny. [123] at 15–16; [136] at 13. Even if the City had argued that the Policy survived strict scrutiny, the Court would still deny the City's motion for summary judgment.

challenged, under *Fulton* the focus appears to be on whether that application is justified by a compelling interest and narrowly tailored to that interest.").

The City argues that vaccination writ large was an effective means of controlling the spread of, and resulting deaths from, COVID-19. *See* [123] at 17–18. Taking this as true, the City does not persuasively explain how this interest is served by granting exemptions to those with signed religious affirmations, but denying exemptions to employees, like Carrero, without signed religious affirmations. Put differently, the City does not explain its interest in allowing those with supportive religious leaders to remain unvaccinated, while mandating vaccination of those without supportive religious leaders. *See Fulton,* 593 U.S. at 542 ("The creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures … The City offers no compelling reason why it has a particular interest in denying an exception to [Catholic Social Services] while making them available to others."); *Does 1-11,* 100 F.4th at 1273 (finding it "highly likely" that a policy would not survive strict scrutiny where the defendant failed to explain "why its interest [in stemming the spread of COVID-19] is served by granting exemptions to practitioners of some religions, but not others").

The City does not argue, for example, that granting a religious exemption to Carrero, or any other employee without a religious leader's signature, would put the public in harm's way, or that there were no other less restrictive means—like accepting an affirmation of Carrero's beliefs from someone else with knowledge of his religious beliefs, as Carrero offered—of achieving the same end. *Boyd*, No. 24 C 2727,

24

2025 WL 2765107, at *6 (denying summary judgment when options other than mandatory vaccination, such as transfer to another position, were possibly available). While the City alludes to concerns over "employees being treated differently" and "increased liability," [123] at 19, speculation over possible lawsuits "is insufficient to satisfy strict scrutiny." *Fulton,* 593 U.S. at 542.

The Court therefore denies the City's motion for summary judgment on Carrero's Free Exercise claim.

### B.      IRFRA

To support a claim under IRFRA, a plaintiff must first show that government action substantially burdened the exercise of his religion through any rule or enactment, even if it is a rule of general applicability. 775 ILCS 35/15. Once the plaintiff has established the substantial burden on the exercise of his religion, the government may defend its rule by showing that the "application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." *Id.* A burden is not the "least restrictive means" of pursuing a compelling interest where the government could have achieved, to the same degree, its compelling interest without interfering with religious activity. *Cassell v. Snyders,* 458 F. Supp. 3d 981, 1000 (N.D. Ill. 2020).

The City argues that the mandate was the least restrictive means of furthering its compelling interest in preventing the spread of COVID-19 to City employees and residents and containing disruptions to City operations. [123] at 17. It points out that,

at the time it implemented the Policy, vaccination was a critical predictor and preventer of COVID-19 diagnoses, hospitalizations, and deaths. *Id.* at 17. And it explains that, unlike masks or social distancing, "vaccination protects the individual *outside of work* and *continuously,"* and without further monitoring. *Id.* at 18.

Though the City's argument may explain why vaccination was the most *effective* means of controlling the spread of COVID-19 generally, it does not explain why denying Carrero's exemption request due to his failure to receive a religious leader's signature was the "least restrictive" means of achieving that goal. *See Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008) ("Even if the prison officials' asserted interests were deemed to be compelling, they do not support their assertion that a clergy verification requirement was the least restrictive means of achieving these ends."). The City does not argue that its religious affirmation requirement was the bare minimum method of controlling the spread of COVID-19. *See Affordable Recovery Hous. v. City of Blue Island,* No. 12-CV-4241, 2016 WL 5171765, at *8 (N.D. Ill. Sept. 21, 2016), *aff'd,* 860 F.3d 580 (7th Cir. 2017) (adopting the minimum standard of national fire safety was the least restrictive means of ensuring fire safety). Nor does the City explain, at least with sufficient force to warrant judgment as a matter of law, why less restrictive means—like allowing Carrero to substitute a peer's signature to attest to the sincerity of his belief—would not achieve the same interest. *See Aiello v. West*, 207 F. Supp. 3d 886, 896 (W.D. Wis. 2016) (denying summary judgment where defendant failed to show that other, less restrictive options of achieving the same compelling interest were not feasible).

26

Like the City's earlier "compelling interest" argument, these questions remain for the jury. The Court therefore denies the motions for summary judgment as to Carrero's IRFRA claim.

### C.    Title VII and IHRA

Under Title VII, it is unlawful for an employer to discharge any individual because of his religion. 42 U.S.C. § 2000e-2(a)(1). "Religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Kluge*, 150 F.4th at 802.

To prevail on a failure-to-accommodate claim, a plaintiff must demonstrate (1) he had a sincerely held religious belief that conflicted with his employer's requirements; (2) he notified his employer of the belief; and (3) the need for a religious accommodation was a motivating factor for the adverse employment decision. *Id.* Once the employee makes this showing, the burden shifts to his employer to show that "any reasonable accommodation would result in undue hardship." *Id.* at 803.

The City challenges two aspects of Carrero's failure to accommodate claim. As discussed above, the City argues that Carrero cannot identify any sincere religious belief that prevented him from receiving a COVID-19 vaccine. Again, that argument is one for the jury.

27

Next, the City argues that any reasonable accommodation of Carrero's beliefs would have imposed an undue hardship on it. An accommodation imposes an undue hardship when the "hardship would be substantial in the context of [the] employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). This inquiry is fact-specific: The Court must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer." *Id.* at 470–71 (internal quotation marks omitted). The employer must "demonstrate an objective undue hardship on its business, not one just subjectively perceived." *Kluge*, 150 F.4th at 808. An employer ultimately bears the burden showing "that any and all accommodations would have imposed an undue hardship." *Adeyeye*, 721 F.3d at 455.

As the earlier-assigned district court reminded the parties, "[w]hether an accommodation would cause undue hardship … is an affirmative defense." [43] at 16; *see also Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013). The City did not raise this affirmative defense in its motion to dismiss or plead this defense in its answer. [43] at 16; [46]. Though Carrero pointed out this failure, both in his own motion for summary judgment and in response to the City's, [119] at 16, [127] at 18, the City never addresses whether it has forfeited this defense.

If a defendant fails to plead an affirmative defense, and if the plaintiff is harmed by the delay or surprise, the Court may find the defense forfeited. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019). Carrero merely points out the City's failure to plead the defense; he does not argue that he was harmed by

the omission. And where he has addressed the defense in his own submissions (both in moving for and opposing summary judgment), no harm is apparent to the Court either. [119] at 16, 18; [127] at 17–18. Therefore, in the interest of resolving the parties' motions for summary judgment on their merits, the Court sets the issue of forfeiture aside in this instance.

The City's motion for summary judgment on this defense still fails. The City argues that granting Carrero's religious exemption request despite his failure to receive a religious leader's signature would have imposed an undue hardship due to the high volume of religious exemption requests the City received and its need to maintain consistency in its review of those requests. [123] at 19. Yet the City does not adequately explain how *removing* a section of the religious exemption form would have imposed additional labor or inconsistency.

The City also hypothesizes that removing the signature requirement "would have significantly reduced the number of employees willing to get vaccinated." *Id.* Perhaps this hypothesis would be stronger if the City could point to factual support showing that many employees beyond Carrero were also denied religious exemption due to their failure to submit a religious leader's signature. Yet the City does not support this hypothesis with any relevant citations to the record. The Court then cannot credit the claim that "significantly" more City employees were willing to get vaccinated because the form required a religious leader's affirmation. The City has not shouldered its burden, at summary judgment, of demonstrating an objective

29

undue hardship on his operation were it to afford Carrero a religious exemption. *Kluge,* 150 F.4th at 808.

Nor is Carrero's motion for summary judgment convincing. Carrero only argues that the City has "submitted *no evidence at all* that it would have suffered undue hardship by granting Carrero's request for exemption from the vaccine mandate." [116] at 18. Yet in citing the burden that unvaccinated workers placed on the city—namely, money spent on less-effective virus control measures, like testing, masking, and distancing—the City has introduced *some* evidence from which a jury could reasonably conclude that shedding the religious leader's signature requirement would result in undue hardship on its operations. Both motions for summary judgment as to undue hardship are therefore denied.

### D. Illinois Tort Immunity Act

The City argues that the TIA bars Carrero's claims "stemming from the City's decisions related to the development and implementation of the Policy and application of the Policy to [Carrero]." [123] at 20.

It cites two sections of the TIA. The first, § 6–104, grants immunity to a local public entity and public employee from liability for "the policy decision to perform or not to perform any act to promote the public health of the community by preventing disease or controlling the communication of disease within the community if such decision was the result of the exercise of discretion vested in the local public entity or the public employee." 745 ILCS 10/6-104. In moving for summary judgment on this affirmative defense, the City's argument mirrors the argument it advanced in its

30

earlier motion to dismiss. [37] at 14. In rejecting that argument, the earlier-assigned district court explained, in part, that because the § 6–104 defense is an affirmative one, "further factual development is required to determine the nature of the Policy at issue, the employee (or employees) involved in rejecting Carrero's application, and that employee's reasons for doing so." *Id.* at 19.

Yet rather than bolster its reliance on this defense with citations to the record and factual analysis, in its motion for summary judgment, the City simply repeats the same legal argument that it presented in its motion to dismiss. *See* [123] at 19–20.[5] In its reply brief, the City does point to some record evidence, but for the reasons already set forth throughout this opinion, the facts that evidence attempts to support—namely, the rationale for the Policy's requirement that a religious leader's signature appear on an exemption request and the reasons why Carrero was denied an exemption—are disputed. So both parties' motions for summary judgment on the City's affirmative defense brought under § 6–104 of the TIA are denied.

The City separately cites TIA § 2-201. This provision provides that "a public employee serving in a position involving the determination of policy or the exercise of

---

[5] Nor does the City persuasively rebut the premise that factual development is warranted. It attaches an unpublished state trial court decision granting a motion to dismiss and holding, in conclusory fashion, that claims like Carrero's are barred under § 6-104. [123-1]. The City does not otherwise engage with the earlier district court's assessment, made when denying the City's motion to dismiss, that given the plain language of § 6-104(a), "that section more plausibly applies to substantive public health acts (or failures to act) … not policy enactments or discretionary policy decisions such as hiring and firing." [43] at 18–19. *See also Missey v. City of Staunton*, No. 08-3212, 2008 WL 4911877, at *1, 3 (C.D. Ill. Nov. 13, 2008) (holding that defendants "cannot be held liable for their discretionary policy decision to issue a boil order while not listing the specific contaminants in the water" in a lawsuit where plaintiffs claimed that defendants failed to sufficiently warn that the public water was contaminated).

31

discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. It immunizes public employees only to the extent that the action for which they are being sued "involves both the making of a policy choice and the exercise of discretion." *See Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 679 (7th Cir. 2009).

Its motion for summary judgment appears to be the first time that the City has raised § 2-201 in this litigation. In its affirmative defenses, the City argued only that "[s]ection 10/6-104 of the Tort Immunity Act bars Plaintiff's claims." [46] at 21 ¶ 3. And Carrero himself did not move for summary judgment on this defense, despite moving for summary judgment on the City's affirmative defense under § 6–104. This strongly indicates that "at no time during the [31] months that the case was pending in the district court did [the City] let out a peep" about this defense. *Herremans v. Carrera Designs, Inc.,* 157 F.3d 1118, 1123 (7th Cir. 1998). As a result, Carrero was not afforded the opportunity to move for summary judgment on the defense, *id.*, and, at a minimum was harmed in this manner by the City's untimely assertion of this defense. The Court therefore finds the City's belatedly asserted defense under § 2-201 of the TIA to have been forfeited. *See Reed*, 915 F.3d at 478.

## IV. Order to File an Affidavit

After summary judgment briefing was underway, Carrero's counsel noticed that quoted language in the City's response to Carrero's motion for summary judgment did not appear in the cited Seventh Circuit case. [144-1] at 4. According to

32

emails filed by Carrero's counsel, Carrero's counsel asked the City's counsel to explain the discrepancy. *Id.* The City's counsel eventually explained that the quote came from a Second Circuit case and the false attribution was an "inadvertent error that occurred when making revisions to the brief." *Id.* at 2; *see also id.* at 1 (counsel for the City describes the error as "harmless"). After Carrero's counsel asked the City's counsel to file a motion to correct the error, *id.* at 1, the City moved to file a corrected brief [138]. The Court granted the City's motion and allowed Carrero to file a surreply. [143].

As it turns out, however, this was not the only citation error in the City's briefing. After reviewing the City's motion for summary judgment, reply in support of its motion, and opposition to Carrero's motion for summary judgment, the Court identified 11 instances where a quoted passage could not be found in the cited opinion, or where a quoted language from the cited opinion was materially modified without indication, or where a proposition was plainly unsupported by the cited passage. Those 11 instances follow, as they appeared verbatim in the City's filings:

- *Hassett v. United Airlines, Inc.,* 2024 WL 1556300, \*3 (N.D. Ill. Apr. 10, 2024) ("unadorned allegations" of "Christian beliefs against getting the COVID-19 vaccine" are insufficient).[6]

- *Wisconsin v. Yoder,* 406 U.S. 205, 215-16 (1972) ("the very concept of ordered liberty precludes allowing [plaintiff], or any other person, a blanket privilege to make his own standards on matters of conduct in which society as a whole has important interests.").

- *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd* 479 U.S. 60 (1986) ("[I]t is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity of someone's religious beliefs").

---

[6] This particular citation to *Hassett* appears twice in the City's submissions.

- *Gardner-Alfred v. FRBNY*, 143 F.4th 51, 67 (2d Cir. 2025) (courts do not hesitate to grant summary judgment where the evidence shows "no reasonable juror could conclude that a plaintiff had a sincerely held religious belief").

- *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) ("a relevant factor in determining sincerity of the belief is the consistency with which the employee has followed the practice").

- *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2003) ("The mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability.").

- *Cox v. City of Boston*, 734 F. Supp. 3d 173, 177 n.1 (D. Mass. 2024) ("The accuracy of medical and statistical information published on website of CDC could not reasonably be questioned, and thus district court would take judicial notice of such information in ruling on motion for summary judgment").

- *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 839, n.4 (N.D. Ill. 2018) ("Public records and government documents available from reliable sources on the Internet are also subject to judicial notice").

- *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 606–07 (7th Cir. 2022) (cited for the proposition that "the Seventh Circuit upheld the City's Policy in August of 2022 finding a compelling interest").

- *Kondilis v. City of Chicago,* No. 23 C 2249, 2024 WL 2370204, at *5 (N.D. Ill. May 23, 2024). *Id.* (also cited for the proposition that "the Seventh Circuit upheld the City's Policy in August of 2022 finding a compelling interest").

These deficiencies implicate counsels' duty of candor to the Court, along with counsels' professional and ethical obligations and responsibilities.

By July 31, 2026, counsel of record for the City are ordered to file an affidavit addressing the citation errors in its motion for summary judgment, reply brief, and opposition to Carrero's motion for summary judgment. The affidavit should include a declaration detailing how these errors came to be; what, if anything, counsel did to validate the citations used in their briefs before filing them with the Court; and what specific procedures and steps will be implemented and followed to ensure that future

34

filings submitted to the Court do not contain inaccurate, incomplete, or misleading citations to legal authority. The Court expects that, before the City's counsel of record file their affidavit, they will thoroughly check all citations in each of its three briefs for accuracy and bring any other inaccurate citations to the Court's attention.

## V.      Conclusion

For these reasons, the Court denies the City's and Carrero's motions for summary judgment. [118], [122]. Counsel for the City is ordered to file their affidavit, as outlined above, by July 31, 2026.

The Court will hold a status hearing at 9:30 a.m. on August 5, 2026, to discuss next steps in this matter. In advance of the status hearing, the parties are directed to meet and confer on potential trial dates and any mutual interest in participating in a settlement conference with the assigned Magistrate Judge. The parties must be prepared at the status hearing to schedule a trial date.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: July 17, 2026

35